UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MACARTHUR DENSON,                   )
                                    )
                Plaintiff,          )    CIVIL ACTION NO.
                                    )    14-14317-DPW
v.                                  )
                                    )
BRUCE GELB,                         )
                                    )
                Defendant.          )

MEMORANDUM AND ORDER
July 13, 2015

Plaintiff MacArthur Denson is currently incarcerated at the
Souza Baranowski Correctional Center ("SBCC") in Shirley,
Massachusetts.  Denson alleges that Bruce Gelb, the
Superintendent of SBCC, is responsible for SBCC's policies for
removing prisoners from their religious diets and that these
policies and their implementation violate his statutory and
constitutional rights.

## I.   BACKGROUND

Denson filed his initial complaint pro se on December 12,
2014 against Gelb in his official and individual capacities.  He
also moved for appointment of counsel, and I denied that motion
without prejudice.  Gelb has filed a motion to dismiss on
grounds of insufficient service of process and failure to state
a claim.  Denson has now renewed his motion to appoint counsel
and he has also moved to amend his complaint, but he has not

provided a proposed amended complaint indicating precisely how he would amend the complaint.  He requests that I stay a decision on the motion to amend and the motion to dismiss until I determine whether to appoint counsel.[1]

The complaint as it now stands alleges that the "Standard Operating Procedures" ("SOP") that govern removal of prisoners from their religious diets are unconstitutional.  Denson does not explicitly state in the complaint that he is a practicing Muslim, but he alleges that he received and was properly entitled to a halal diet and he mentions observance of Ramadan and religious fasts.  He does not state when he was first put on a halal diet, but the complaint alleges that he was removed from the halal diet first temporarily and then permanently.  Denson alleges that the SOP calls for the removal of a prisoner from an approved religious diet for failing to access their special meal, or for accessing the general menu, three times within a thirty day period, even if the general menu is the same as the halal menu for a particular day.  Compl. ¶ 7, 13.  A first

---

[1] Denson has outlined in broad terms in his most recent filing (Doc. No. 29) the numerous areas in which an amended complaint would be modified to survive a motion to dismiss.  In an earlier filing (Doc. No. 27), Denson notes the "complexities of the case" and that the task of amending properly is "beyond his ability," explaining why he filed a motion for the appointment of counsel and requesting a stay on the motion to amend until the motion for appointment of counsel could be resolved.

removal is for sixty days, after which a prisoner may reapply for the religious diet. *Id.* ¶ 8. A prisoner removed twice within a twelve-month period is permanently removed from the religious diet. *Id.* ¶ 9. The SOP does not distinguish between prisoners who do not access their meal due to illness or religious fasting, and Denson alleges that he suffers from a chronic illness and routinely observes religious fasts. *Id.* ¶ 11-12.

Denson also includes various allegations about his own removal from the religious diet list. He alleges that on one occasion he was temporarily removed from the halal diet for not signing for his requested diet from the kitchen during a period when he was being housed in a restrictive housing unit that did not permit prisoners to access the kitchen. *Id.* ¶¶ 16-24. Denson was later permanently removed from his religious diet on February 20, 2013. *Id.* ¶ 29. He contests the circumstances that led to his removal. *Id.* ¶¶ 31-36.

Denson alleges that most prisoners receiving a halal diet have been removed from that religious diet due to the SOPs, but he does not explicitly tie this to the content of the SOP and any particularly harsh effect on Muslim prisoners. *Id.* ¶¶ 37-38. Denson alleges that as a result of his own removal from the religious diet, he has had to spend thousands of dollars at the institutional canteen to supplement his diet, *id.* ¶ 40, and that

3

at one point Gelb allowed the imposition of a sixty-day loss of canteen sanction, which resulted in Denson's having to eat food inconsistent with his faith, *id.* ¶ 41.  Denson challenges the process by which the removal is effected as well as the SOPs themselves in that they do not take into account the reason a prisoner did not access the special diet.  *Id.* ¶¶ 15, 43.

Denson asserts violations of (1) the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq., (2) the First Amendment to the United States Constitution, (3) Equal Protection and (4) Due Process under the Fourteenth Amendment of the United States Constitution, as well as similar claims under the Massachusetts Declaration of Rights, including deprivation of (5) religious freedom, (6) equal protection, (7) and due process, (8) the right to worship under Mass. Gen. Laws c. 127 § 88m (9) Department of Corrections regulations and policies, and (10) civil rights under the Massachusetts Civil Rights Acts, Mass. Gen. Laws c. 12, § 11(H) and (I).  Denson seeks injunctive relief, including an order requiring Gelb to provide Denson with a halal diet and preventing Gelb from suspending or permanently removing Denson from his religious diet, various forms of compensation and restitution, punitive damages, costs, and attorneys fees.[2]

---

[2] Denson has also filed motions for a temporary restraining order (Doc. Nos. 5 & 15) and a motion to waive a bond (Doc. No. 17).

## II.   ANALYSIS

### A.   *Motion to Dismiss and Motion to Amend*

I will permit Denson to amend his complaint and instruct the Pro Se Staff Attorneys Office to make efforts to secure counsel for Denson in doing so.

Denson has not submitted a proposed amended complaint, so I am not in a position to analyze closely the viability of any claims that might be included in an amended complaint.  I observe, however, that where it is apparent that even an amended complaint necessarily would fail to state a claim upon which relief could be granted, then the amendment would be futile. *See Glassman* v. *Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996).  In reviewing for futility, a court will apply the same standard of legal sufficiency as I would apply to a Rule 12(b)(6) motion.  *Id.*  Therefore, although I deem Gelb's motion to dismiss moot in light of the prospects for a future amendment of the complaint, I will still consider whether any of the arguments in the motion to dismiss are meritorious and would necessarily apply to an amended complaint.  In this connection, I direct the parties' attention to a Memorandum and Order I have

---

Given the plaintiff's self-acknowledged unfamiliarity with legal procedure, these motions are not adequately supported and will be denied.  Whether counsel, if and when secured, will seek to renew motions of this type in a fully supported form remains to be seen.

issued today, *Greene* v. *Cabral*, Civ. Action No. 12-11685 (D. Mass. July 13, 2015), dealing at greater length with issues similar to those presented in this case.  A copy of the *Greene* Memorandum and Order is attached hereto as Exhibit A.

One argument made by Gelb in the motion to dismiss is that certain of the allegations against Gelb must be dismissed due to sovereign immunity under the Eleventh Amendment of the United States Constitution.  Briefly stated, sovereign immunity bars all claims for damages against states, and this includes claims against state employees acting in their official capacities. *See generally Seminole Tribe of Florida* v. *Florida*, 517 U.S. 44, 72 (1996).  A more extensive discussion of sovereign immunity in the context of prison litigation can be found in Section III of the *Greene* Memorandum and Order.  Under this doctrine, all claims under state law against unconsenting states, including an employee of the state acting in his or her official capacity, must be dismissed and claims for damages under federal law against unconsenting states must also be dismissed.  *Id.*  Gelb, as superintendent of a state correctional institution, is undisputedly a state employee.  Therefore, Denson's claims against Gelb in his official capacity for damages under federal law and for all relief under state law do not state a claim upon which relief may be granted and any future amendment seeking to do so would be futile.

6

I further note some skepticism, based on the current complaint, that Denson will be able to amend the complaint in such a way as to avoid dismissal under the doctrine of qualified immunity of all claims for damages against Gelb in his individual capacity.  I briefly note here that qualified immunity requires a two-part inquiry, including whether a constitutional violation is alleged and whether that violated right was "clearly established."  *See Ford* v. *Bender*, 768 F.3d 15, 23 (1st Cir. 2014).  The principles are covered in Section V of the attached Memorandum and Order in *Greene*.  It seems unlikely that claims on the current theory of denial of a religious diet due to claimed disciplinary infractions would be considered a violation of a clearly established right, particularly since this is a claim that appears to be the subject of an emerging circuit split.  *Compare Kuperman* v. *Warden*, 2009 WL 4042760 (D.N.H. Nov. 20, 2009)(*Kuperman II*)(finding claims of inmate denied kosher food for a dietary violation to be moot due to modifications of religious diet policy, but noting the possibility that even the modified policy could be a substantial burden on religious exercise) and *Kuperman* v. *N.H. Dep't of Corr.*, 2007 WL 1200092 (D.N.H. Apr. 18, 2007)(*Kuperman I*) (recommending a preliminary injunction where an inmate was denied a kosher diet as a penalty for occasions where he was alleged to have eaten non-kosher food)

*with Daly* v. *Davis*, 2009 WL 773880 (7th Cir. Mar. 25, 2009)(holding that a prison's program that removes prisoners from religious diets for failure to comply with the religious diets does not substantially burden exercise of religion). Denson and his counsel, if one is secured, will nonetheless have the opportunity to reformulate his complaint to address the issue of qualified immunity in further briefing.

**B.   *Appointment of Counsel***

Denson has sought appointment of counsel to assist him in prosecuting his case.  Civil plaintiffs do not have a constitutional right to appointed counsel.  *DesRosiers* v. *Moran*, 949 F.2d 15, 23 (1st Cir. 1991).  The statutory authority that permits courts to "request an attorney to represent any person unable to afford counsel," 18 U.S.C. §1915(e)(1), is discretionary.  *King* v. *Greenblatt*, 149 F.3d 9, 14 (1st Cir. 1998).  A district court is only "compelled to invoke the statute," and the First Circuit will only find reversible error in denying appointment of counsel, if "exceptional circumstances were present such that a denial of counsel was likely to result in fundamental unfairness impinging on [plaintiffs'] due process rights."  *Id.* (quoting *DesRosiers*, 949 F.2d at 23).

After reviewing the current complaint, particularly in light of my parallel review in *Greene*, I am satisfied that some of Denson's claims, particularly the claims for prospective

relief under federal law, may have significance.  The issue of
when an institution is permitted to withdraw religious diets
presents an open question.[3]  The First Circuit has not addressed
this issue, and as Judge LaPlante has observed, it is an issue
that has been slowly percolating through other circuits.  *See*
*Kuperman II*, 2009 WL 4042760, *6 ("A circuit split is brewing on
this very issue," referencing the decisions in *Lovelace* v. *Lee*,
472 F.3d 174 (4th Cir. 2006) and *Brown-El* v. *Harris*, 26 F.3d 68,
69-70 (8th Cir. 1994)).  While Denson has limned his claims to
the best of his ability to this point, the potential merit of
this relatively novel and important legal issue would best be
developed by trained counsel.  Consequently, I will direct the

---

[3] The only decisions within this circuit that have addressed a
similar situation are *Kuperman II*, 2009 WL 4042760, and *Kuperman*
*I,* 2007 WL 1200092, which held that denial of religious diet to
a prisoner who has a sincere religious belief that the diet is
necessary to his practice of religion because of a failure to
comply completely with an unyielding administrative policy
concerning religious diets is a constitutional violation
(although *Kuperman II* dismissed the claim as moot due to a
change in the religious diet policy).  The mootness of the
*Kuperman* litigation notwithstanding, I must note that Magistrate
Judge Muirhead in *Kuperman I*, 2007 WL 1200092 at *4 developed a
helpful analogy in the context of prisoners who are denied
religious diets despite no finding of insincerity, noting, "If a
diabetic inmate were placed on a medically appropriate diet, and
was then caught purchasing a candy bar from the canteen, the
prison would not be justified in removing the inmate from his
medical diet and forcing him to eat a high sugar diet for six
months for the violation," although other discipline may be both
appropriate and sufficient.

Pro Se Staff Attorneys Office to take all reasonable steps to secure counsel for the plaintiff in this matter.

### III. CONCLUSION

For these reasons, it is hereby ORDERED that:

1.  Plaintiff's Renewed Motion to Appoint Counsel (Doc. No. 24) is GRANTED to the extent that the Pro Se Staff Attorneys Office is directed to take all reasonable steps to secure counsel for Denson, Plaintiff's Supplemental Motion for Appointment of Counsel (Doc. No. 26) is MOOT;

2.  Plaintiff's Motion to Amend Complaint (Doc. No. 25) and Plaintiff's Supplemental Motion to Amend Complaint (Doc. No. 29) are DENIED without prejudice to renewal once counsel is appointed;

3.  Plaintiff's Motion to Stay (Doc. No. 25) until resolution of the Motion to Appoint Counsel is GRANTED to the extent that the Pro Se Staff Attorneys Office will submit a status report on or before September 30, 2015, indicating whether counsel has been found to represent the plaintiff; if such counsel is identified, the stay shall be lifted and the Clerk shall promptly set the matter for a scheduling conference;

4.  Plaintiff's Motion to Stay Ruling on Defendant's Motion to Dismiss (Doc. No. 27) is MOOT;

5.   Defendant's Motion to Dismiss (Doc. No. 22) is MOOT in
     light of the prospect of renewal of a motion to amend the
     complaint if and when counsel is secured for plaintiff.

6.   Plaintiff's motions for a temporary restraining order (Doc.
     Nos. 5 & 15) and to waive a bond (Doc. No. 17) are DENIED.


                              */s/ Douglas P. Woodlock*
                              DOUGLAS P. WOODLOCK
                              UNITED STATES DISTRICT JUDGE

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TIMOTHY GREENE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 12-11685-DPW |
| v. | ) | |
| | ) | |
| ANDREA CABRAL, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER
July 13, 2015

Plaintiff Timothy Greene is a practicing Orthodox Jew who
was incarcerated in the custody of the Suffolk County Sheriff's
Department ("the Department") from May 2011 to October 2012 and
from February 2013 to an unidentified date prior to the hearing
in this matter.  Greene contends that during these periods he
was denied calorically adequate kosher food as well as access to
religious services.  The remaining defendants[1] are individuals
who he claims were responsible for his care and custody during
the periods of his incarceration.  Greene seeks damages and
prospective injunctive and declaratory relief.  Defendants move
to dismiss the complaint.

---

[1] This case was initially captioned Greene v. *Suffolk County
Sheriff Department*, but the Department was terminated as a party
on February 27, 2013.

## I. BACKGROUND

Greene is a convert to Judaism and practices as an Orthodox Jew.  Compl. ¶ 10.  He alleges that his sincerely held religious beliefs require him to maintain a kosher diet, meaning a diet consistent with Jewish law.  *Id.* ¶ 12.  Greene informed the Department that he needed kosher meals, and he was placed on a list of inmates who receive kosher meals.  *Id.* ¶ 15.  The complaint does not allege when that request was made or when he was placed on the list.  The Department does not provide a kosher breakfast option for inmates, *id.* ¶ 22, instead serving the same meal, prepared with non-kosher utensils, to all inmates, *id.* ¶ 21.  The Department occasionally opened otherwise kosher meals with non-kosher utensils, exposing the food to contaminants, *id.* ¶ 25, and intermingled kosher and non-kosher food on the same trays in a way that violates the rules of a kosher diet.  *Id.* ¶ 27.

The Department served meals that purported to be kosher twice a day during the period of Greene's incarceration.  *Id.* ¶ 29.  These two meals combined typically contained approximately six hundred or fewer calories.  *Id.* ¶ 30.  Greene saved wrappers from some of these meals, and he alleges that on one day he was served two meals totaling only five hundred calories for the entire day.  *Id.* ¶ 31.  On another day he was provided with two meals totaling only seven hundred and ten

2

calories. *Id.* ¶ 32.  He has provided copies of the labels from those two days as an exhibit to the complaint.  When he complained about his lack of access to calorically adequate kosher food, he was told to eat the non-kosher food or to go hungry.  *Id.* ¶ 34.

Greene also alleges that the Suffolk County House of Correction ("the HOC") severely limited his access to religious services.  There are no regularly held services for Jewish people in custody at the HOC, *id.* ¶ 36, nor are there non-denominational services, *id.* ¶ 36.  Greene was told that rabbis were not offered to inmates, *id.* ¶37.  Non-Jewish inmates in the custody of the department, however, do have access to religious services.  *Id.* ¶ 42.

Greene has alleged violations of federal and state law against numerous administrative defendants.  These defendants are Andrea Cabral, the former Sheriff of Suffolk County, sued in her individual capacity; Steven Tompkins, the current Sheriff of Suffolk County, sued in his individual and official capacities; Gerard Horgan, the former Superintendent of the Suffolk County House of Correction, sued in his individual capacity; Yolanda Smith, the current Superintendent of the Suffolk County House of Correction, sued in her individual and official capacities; and Anne Nee, the Director of Social Services, sued in her individual and official capacities.  Greene initially brought

3

this action *pro se* but never served the defendants.  On January
15, 2013, he began to be represented by counsel.  Greene filed a
first amended complaint on February 26, 2013, and properly
served the defendants.  At that time, Greene also dismissed the
Suffolk County Sheriff's Department as a defendant.  Defendants
moved to dismiss and Greene moved to further amend the
complaint.  He filed a Second Amended Complaint in December
2013.

Greene alleges that he filed grievances on June 18, 21, and
24, 2012, as well as on April 19, 2013, about the food he was
provided.  *Id.* ¶¶ 56, 57, 58, 60, 62.  After filing one of the
grievances, he was told to contact Director Nee, which he did.
She did not resolve his complaint.  *Id.* ¶¶ 58, 59.  On June 16,
2013, he filed a grievance concerning lack of access to non-
denominational or Jewish religious services.  Id. ¶ 63.  The
response he received suggested that Greene contact an outside
rabbi or synagogue to set up a special visit, but Greene does
not have a rabbi he could ask to see him.  *Id.* ¶ 63, 64.  He
followed up with people recommended in the grievance denials,
but received no remedy.  *Id.* ¶ 65.

In the Second Amended Complaint, Greene presents a theory
of supervisory liability against each of the defendants based on
each defendant's role in implementing practices, programs, or
policies that Greene claims caused the violations he alleges.

For former Sheriff Cabral and current Sheriff Tompkins, Greene alleges that each is or was responsible for "overseeing the operation and conditions of the correctional institutions in Suffolk County" and is or was "responsible for promulgating and implementing practices and policies" and ensuring the enforcement of the law. *Id.* ¶¶ 86, 88. He claims that each knew or should have known that Jewish inmates lack access to kosher meals, religious services and religious materials. *Id.* ¶¶ 87, 88.

Former Superintendent Horgan and current Superintendent Smith are alleged to be or to have been "[r]esponsible for supervision and daily operations of the Suffolk County House of Correction" as well as for "promulgating and implementing practices and policies, providing proper training to correctional staff" and ensuring enforcement of the law. *Id.* ¶¶ 89, 90. Greene alleges that both knew or should have known that Jewish inmates lacked access to kosher meals, religious services, and materials, in violation of the law, *id.,* adding that former Superintendent Horgan knew that this was "by Department policy and practice," *id.* ¶ 89, and that Superintendent Smith knew this "[d]ue to her involvement with training, and promulgation of the practices and procedures of the Suffolk County House of Correction," *id.* ¶ 90.

5

Director Nee is alleged to be responsible for "supervision and daily operation of religious services within the Suffolk County House of Correction." *Id.* ¶ 91.  She knew or should have known that Jewish inmates lacked access to calorically adequate kosher meals and religious services in violation of the law "[d]ue to her involvement and implementation of the religious practices and procedures of the Suffolk County House of Correction, and her direct contact with Mr. Greene during the grievance process." *Id.*

Greene further states that the defendants "have each been involved in or are aware of the creation, training, oversight and implementation of the Department's religious programs" including religious services, materials, and diets, and the fact that the diet provided pursuant to these programs "only sometimes complies with the rules of Kashrut and Jewish inmates' sincerely held beliefs." *Id.* ¶ 102.  He claims that the defendants "were aware of the risk to Mr. Greene's health and safety and deliberately disregarded that risk" by failing to provide him with sufficient caloric intake. *Id.* ¶ 104.  At another point in the complaint, Greene claims that defendants "were each involved in training, and each oversaw or implemented policies, or were aware of the implementation of policies, that provided inmates requiring a Kosher diet[] only two meals a day. Further, Defendants have trained and overseen both the unit

6

officers, chaplains, and kitchen lieutenant, and created the policies that these subordinates enforce, when they have resorted to coercive tactics to force Mr. Greene to go without food or to abandon his sincerely held religious beliefs." *Id.* ¶ 112.

Greene asserts claims in six counts: for (1) violations of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc et seq, against defendants Tompkins, Smith and Nee in their official capacities; for violations of 42 U.S.C. § 1983 against all defendants based on infringements of (2) the right to freedom of religion in the First and Fourteenth Amendments to the United States Constitution, (3) the right to equal protection in the Fourteenth Amendment to the United states Constitution, and (4) the right to be free from cruel and unusual punishment under the Fourteenth Amendment to the United States Constitution; and for violations of state civil rights against all defendants under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I, based on infringements of (5) the right to religious freedom and (6) the right to be free from cruel and unusual punishment.  Defendants now move to dismiss the Second Amended Complaint for failure to state a claim upon which relief may be granted, asserting variously sovereign immunity, qualified immunity, and inadequate pleading.

## II. LEGAL STANDARD

In resolving a motion to dismiss under Rule 12(b)(6) of the
Federal Rules of Civil Procedure, I treat as true all non-
conclusory factual allegations in the complaint, while
identifying and disregarding statements in the complaint that
offer "legal conclusions" or "threadbare recitals of the
elements of a cause of action." *Ocasio-Hernandez* v. *Fortuno-
Burset*, 640 F.3d 1, 12 (1st Cir. 2011)(quoting *Ashcroft* v.
*Iqbal*, 556 U.S. 662, 678 (2009)). I do not consider the
likelihood of plaintiff's success on the merits. *Id.* If I am
able to draw a reasonable inference that defendants are liable
for the alleged misconduct, then the claim is plausible and I
must deny the motion to dismiss. *Id.*

## III. SOVEREIGN IMMUNITY

Sovereign immunity under the Eleventh Amendment of the
United States Constitution protects states from suit in federal
court unless the state waives immunity. "The Eleventh Amendment
prevents congressional authorization of suits by private parties
against unconsenting states." *Seminole Tribe of Florida* v.
*Florida*, 517 U.S. 44, 72 (1996). Sovereign immunity from suits
authorized by federal law does not extend to municipalities, it
extends "only to States and arms of the State." *Northern Ins.
Co.* v. *Chatham County*, 547 U.S. 189, 193 (2006). Despite its
municipal title, the Suffolk County Sheriff's Department, which

8

oversees the correctional facilities in Suffolk County, is
controlled directly by the Commonwealth of Massachusetts and all
employees of the Department are employees of the Commonwealth.
Mass. St. 2009, c. 61, §§ 3, 13 (effective January 1,
2010)(transferring Barnstable, Bristol, Dukes, Nantucket,
Norfolk, Plymouth, and Suffolk Sheriffs and their employees to
the Commonwealth, ". . . all employees of the office of a
transferred sheriff . . . are hereby transferred to that
transferred sheriff as employees of the commonwealth."). 
Massachusetts Sheriff's Departments are therefore considered
arms of the state and are entitled to sovereign immunity. *See
Jeffrey Gallo, et al.* v. *Essex County Sheriff's Dept.*, 2011 WL
1155385 at *3 (D. Mass. March 24, 2011).

Greene has asserted federal and state law claims against
Tomkins, Smith, and Nee in their official capacities as
employees of the state. He does not contest that sovereign
immunity bars official capacity claims against state officials
for punitive and compensatory damages. Such claims, including
those under RLUIPA, must be dismissed. *See Sossamon* v. *Texas*,
131 S.Ct. 1651, 1659 (2011) (noting that states do not waive
sovereign immunity by accepting funding under RLUIPA).

Greene also, however, advances claims for prospective
relief, including declaratory relief and an injunction. These
types of claims survive the assertion of sovereign immunity

9

pursuant to *Ex Parte Young*, 209 U.S. 123 (1908).  Where a plaintiff seeks "prospective injunctive relief" rather than a retroactive award, the Eleventh Amendment does not present an obstacle.  *See Id.*, *Edelman* v. *Jordan*, 415 U.S. 651, 677 (1974).

The force of the Eleventh Amendment is even more potent when faced with state-law claims against state officials.  "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."  *Pennhurst State School & Hosp.* v. *Halderman*, 465 U.S. 89, 106 (1984).  Thus, the prospective relief exceptions outlined in *Young* and *Edelman* do not apply to claims against state officials based on state law, such as those presented in Counts 5 and 6, to the extent they raise official capacity claims.  *Id.* (The doctrinal basis for *Young* and *Edelman* disappears where plaintiffs allege violations of state law because a "federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.")

### IV. PROSPECTIVE RELIEF UNDER FEDERAL LAW

I next consider whether injunctive or declaratory relief, the type of prospective relief permitted against states under *Young*, 209 U.S. 123, may be appropriate in this case.  Greene requests declaratory and injunctive relief in his Second Amended

Complaint, *c.f. Mitchell* v. *Massachusetts Dept. of Correction*, 190 F.Supp.2d 204 (D. Mass. 2002)(finding that *Young* does not apply because the plaintiff did not request prospective relief). While Greene properly has requested this relief, I must consider whether Greene's request for these forms of relief is moot.  The parties have not included any argument about mootness in their memoranda.

Greene states in his complaint that he has been in the custody of the Suffolk County Sheriff's Department from May 2011 to October 2012 and from February 2013 to the present.  Greene does not admit in his complaint that the violations of which he complains have ceased*.  C.f. Seaver* v. *Manduco*, 178 F.Supp.2d 30, 36 (D. Mass. 2002)(finding that injunctive relief would be inappropriate given plaintiff's admission that the violation was in the past and was not ongoing).  Instead, he alleges that the violations spanned his earlier and current periods of incarceration, that the violations happen "routinely," *id*. ¶ 1, and that the violations continue, *id.* ¶ 95, 101, 107, 112.

At oral argument on the motion to dismiss, I inquired whether Greene remained in custody, and his counsel informed me that he has been released.  While Greene's release is not documented in the complaint, the parties agree that he is not currently in the custody of the Department.  Based on undisputed representations from counsel, representations that could "be

11

accurately and readily determined from sources whose accuracy

cannot reasonably be questioned" if there were any purported

disagreement about the underlying facts, I take judicial notice

of the fact that Greene is not currently in the custody of the

Department.  *See* Fed. R. Evid. 201.

Because Greene is no longer in the custody of the

Department, the request for prospective relief is moot under

governing First Circuit law.  *See Ford* v. *Bender*, 768 F.3d 15,

29 (1st Cir. 2014)("A prisoner's challenge to prison conditions

or policies is generally rendered moot by his transfer or

release.")  Greene mentions in passing in his memorandum his

entitlement to prospective relief because he is "subject to

future incarceration by the Defendants," but he does not expand

on this argument in the context of mootness.  This seems to be a

reference to the general exception to the mootness doctrine for

conduct that is capable of repetition yet evading review.  *Id.*

at 30.  A future risk of reincarceration is typically not viewed

as demonstrating a reasonable probability of recurrence.  *Id.*

("we generally have been unwilling to assume that the party

seeking relief will repeat the type of misconduct that would

once again place him or her at risk of that injury")(quoting

*Honig* v. *Doe*, 484 U.S. 305, 320 (1988)).  Greene has presented

no other information from which I can conclude that there is a

reasonable probability of recurrence within the legal framework
laid out by the First Circuit.[2]

### V. QUALIFIED IMMUNITY

Qualified immunity is an affirmative defense for which the
defendants bear the burden of proof. *DiMarco-Zappa* v.
*Cabanillas*, 238 F.3d 25, 35 (1st Cir. 2001).  It limits
government officials' exposure to liability for damages in their
individual capacities, but does not shield them from prospective
relief. *Ryder* v. *United States*, 515 U.S. 177, 185 (1995).  The
question whether qualified immunity is appropriate should be
"resolved at the earliest possible stage in litigation," because
it is designed to give government officials protection from the
entire litigation process, not merely from liability, if
immunity is appropriate. *Maldonado* v. *Fontanes*, 568 F.3d 263,
268 (1st Cir. 2009).  At the motion to dismiss stage, any

---

[2] The defendants also argue that Greene is barred from suing the
defendants in their official capacities because § 1983 claims
lie only against "persons" and "neither a State nor its
officials acting in their official capacities are 'persons'
under § 1983." *Will* v. *Michigan Dept. of State Police*, 491 U.S.
58, 71 (1989).  While this argument provides an additional
reason to dismiss the official capacity allegations for
compensatory and punitive damages, it does not provide an
additional reason to dismiss any claim for prospective relief.
The Supreme Court in *Will* went on to clarify that "[o]f course a
state official in his or her official capacity, when sued for
injunctive relief, would be a person under § 1983 because
'official-capacity actions for prospective relief are not
treated as actions against the state." *Id.* at n. 10 (quoting
*Kentucky* v. *Graham*, 473 U.S. 159, 167, n.14 (1985)).

assessment of qualified immunity requires me to evaluate the
sufficiency of the defense on the face of the plaintiff's
pleadings.  *Id.*

Qualified immunity requires a two-part inquiry: whether the
allegations make out a constitutional violation, and whether the
violated right was clearly established at the time of the
offending conduct.  *Ford*, 768 F.3d at 23.  The "clearly
established" inquiry, in turn, considers the clarity of the law
at the time of the alleged violation and whether a reasonable
defendant would understand that his or her conduct violated the
plaintiff's constitutional rights.  *Id.*

Greene contends that, as a preliminary matter, the
defendants have not established that their actions were in the
scope of a "discretionary function."  Defendants cite two cases
from Georgia federal district courts that note that the
defendants had not shown that they were engaged in a
discretionary function, and consequently could not invoke
qualified immunity.  *See Street* v. *City of Bloomingdale*, 2007 WL
1752469, at *4 (S.D. Ga. June 15, 2007); *Reed* v. *Okereke*, 2006
WL 2444068, at *19 (N.D. Ga. Aug. 22, 2006).  The argument from
the negative pregnant is that if that showing were made,
qualified immunity may have been available.  While the Eleventh
Circuit regularly analyzes in detail whether an official is
acting within the official's discretionary authority as a

14

prerequisite to a qualified immunity analysis, *see, e.g., Lumley* v. *City of Dade City, Fla.*, 327 F.3d 1186 (11th Cir. 2003) ("To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."), courts elsewhere, and in the First Circuit in particular, typically spend little time on this element.  The First Circuit has held that "[g]enerally, prison officials and officers are included in the category of those whose positions qualify them for such immunity."  *Brown* v. *Ponte*, 842 F.2d 16, 18 (1st Cir. 1988)(*per curiam*)(citing *Procunier* v. *Navarette,* 434 U.S. 555, 561(1978)).

Each of the defendants here was alleged by the plaintiff to be involved in making high-level determinations about the practices and policies of the Suffolk Department of Correction or Suffolk House of Correction and their misconduct is alleged to be the creation or implementation of an improper practice or policy.  Greene's efforts to undercut the claim of qualified immunity based on a non-discretionary function fails.

Defendants do not challenge in any particularized manner the conclusion that their conduct as alleged amounts to a constitutional violation. Even their conclusory language, "Defendants contend that the action they took in response to Plaintiff's numerous complaints, grievances and requests did not violate the Plaintiff's constitutional rights," seemingly misses

the point.  Greene's primary theory is that the Defendants are
liable for creating and implementing the policies that led to
his being deprived of calorically adequate kosher food and
Jewish religious services, not that they themselves were
directly involved in the violations or the remedial process.
While Greene has an additional factual hook for his claims
against Nee based on his filing a grievance to her directly, the
focus of this action is not the response to Greene's complaints
but rather the policies that he claims led to his being provided
calorically inadequate kosher food and being denied access to
religious services.

It is clearly established that a prisoner must have "a
reasonable opportunity of pursuing his faith comparable to the
opportunity afforded fellow prisoners who adhere to conventional
religious precepts."  *Cruz* v. *Beto*, 405 U.S. 319, 322 (1972).
Multiple federal and state laws provide protection for inmates'
free exercise of their religion.  For example, RLUIPA prohibits
prisons that receive federal funds from imposing a "substantial
burden" and an inmate's religious exercise in the absence of the
prison's demonstration that the imposition of such a burden "(1)
is in furtherance of a compelling governmental interest; and (2)
is the least restrictive means of furthering that compelling
governmental interest."  42 U.S.C. § 2000cc-1(a).  Massachusetts
law similarly requires that "an inmate of any prison or other

16

place of confinement shall not be denied the free exercise of

his religious belief and the liberty of worshipping God

according to the dictates of his conscience in a place where he

is confined."  Mass. Gen. Laws c. 127 § 88.

In addition to identifying general rights that touch on

freedom of religious practice for inmates, I must consider

whether the specific rights Greene alleges were violated were

clearly established and "determine whether an alleged right was

established with sufficient particularity that a reasonable

official could anticipate that his actions would violate that

right."  *Borucki* v. *Ryan*, 827 F.2d 836, 838 (1st Cir. 1987).

Concerning the claim that the kosher food provided to Greene was

calorically inadequate, the First Circuit noted in 2013, that

"it has been held that 'a prisoner's religious dietary practice

[will be found to be] substantially burdened when the prison

forces him to choose between his religious practice and adequate

nutrition.'"  *LeBaron* v. *Spencer*, 527 Fed.Appx. 25, 30 (1st Cir.

2013)(quoting *Nelson* v. *Miller*, 570 F.3d 868, 879 (7th Cir.

2009).[3]

---

[3] There may be a stronger argument that the claims related to
cruel and unusual punishment are not based on clearly
established rights given uncertainty in the law about whether
caloric deprivation related to religious observance is the same
as caloric deprivation generally, the latter being a clear
Eighth Amendment violation, *Farmer* v. *Brennan*, 511 U.S. 825,
832-33 (1994).  *Compare Campbell* v. *Cornell Corr. of Rhode
Island, Inc.*, 564 F. Supp. 2d 99, 102-03 (D.R.I. 2008)(holding

17

Rights of inmates are evaluated while considering the
burden on the prison and giving "due deference to the experience
and expertise of prison and jail administrators."  *Spratt* v.
*Rhode Island Dept. of Corrections*, 482 F.3d 33, 39 (1st Cir.
2007)(quoting *Cutter* v. *Wilkinson*, 544 U.S. 709, 717 (2005)).
On the face of the pleadings as they stand now, the defendants
have not argued or made a showing that the rights that Greene
claims were violated were not clearly established.  Of course as
the case moves forward, additional facts about the scope and
nature of the alleged violations could lead to a different
conclusion.

Defendants next argue that even if the rights were clearly
established, the action they took in response to Greene's
complaints and requests did not violate Greene's constitutional

---

that a claim that an inmate was denied food that was consistent
with his religious belief was distinct from a claim of
inadequate quantity of food or inadequate nutritional value and
therefore does not state a claim under the Eighth Amendment)
*with Hall* v. *Sutton*, 2012 WL 407244 (S.D. Ill. Feb. 8,
2012)(holding that a claim that a Muslim inmate was only
provided with 1000 calories worth of food before sunrise and
after sunset during Ramadan could be sufficient to satisfy the
objective prong of the Eighth Amendment, drawing no distinction
between deprivation of calories generally and those based on
religious observance) *and with Florer* v. *Bales-Johnson*, 752
F.Supp.2d 1185, 1200 (W.D. Wash. 2010) aff'd 473 F. App'x 651
(9th Cir. 2012)(Eighth amendment requires nutrition adequate to
maintain health, Kosher menu need not meet USDA nutritional
guidelines as those recommendations are not constitutional
requirements on their own, drawing no distinction between
nutritional deprivation for purposes of religious observance and
for other reasons).

rights.  They do not provide any support for this argument,
however, other than their claims that Greene does not allege
that they (other than defendant Nee) were aware of the
violations, and that any response was reasonable.  While Nee is
the only defendant that Greene claims was directly aware of at
least some of the violations, this action is not predicated on a
theory that the defendants were actually aware that Greene in
particular was being deprived of kosher food, sufficient caloric
intake, and religious materials and services.  Instead, Greene
alleges that each of the defendants was aware of and implemented
policies and practices that they knew or should have known led
to Jewish inmates being denied calorically adequate kosher food
and access to religious services.  The policies and practices
are what Greene claims to be the defendants' violations here,
not their roles in his own deprivation.

     As for defendant Nee, Greene has alleged that she did not
in any way remedy the violation of which he complained.  Greene
therefore adequately alleges knowledge, individualized for Nee
and based on policies and practices for all of the defendants,
that could be the foundation for a finding of a constitutional
violation, and the complaint does not provide any grounds for
the defendants' arguments that their responses to the existence
of a violative policy or to Greene's individual situation were
reasonable.

Aside from challenging the lack of knowledge, defendants also attempt to argue that at the motion to dismiss stage I can assume that the only alleged violations occurred during the six-day period in June 2012 plus on the one occasion in April 2013 that Greene filed formal grievances and that I must assume that on the other dates the food and access to religious services was not a problem.  They further argue that I must assume that the responses to the grievances were satisfactory because Greene did not file follow-up grievances.  These arguments neglect the essential fact that at the motion to dismiss stage, I must "accept the well-pleaded facts in the operative complaint as true, construing them in the light most favorable to . . . the nonmoving party."  *Lydon* v. *Local 103, Intern. Broth. Of Elec. Workers*, 770 F.3d 48, 50 (1st Cir. 2014).  I accept Greene's allegations as true and view them in the light most favorable to him.  Consequently, contrary to the defendants' arguments here, I must accept that "[i]n the two meals a day that [the Department] does provide, the Department regularly fails to comply with Kosher requirements," Compl. ¶ 24, and other allegations by Greene that the violations were regular and ongoing.  The lack of additional grievances does not indicate that the grievances were resolved.

20

At this stage, taking the plaintiff's well-pled allegations as true, I find that constitutional violations have been alleged adequately and the violations alleged are clearly established.

## VI. RLUIPA AND INDIVIDUAL CAPACITY CLAIMS

The Department contends that RLUIPA applies only to defendants acting in their official capacities, and because sovereign immunity bars such claims, as discussed above, there is no viable RLUIPA claim against defendants.  The First Circuit has not addressed the issue whether RLUIPA can reach actions against individuals acting in their individual, rather than official, capacities.  The Third, Fourth, Fifth, Seventh, Tenth, and Eleventh Circuits, however, have taken the view that FLUIPA does not allow for personal capacity claims for monetary damages.  *See, e.g., Sharp* v. *Johnson*, 669 F.3d 144, 154 (3d Cir. 2012) (collecting cases from other circuits sharing this view).

Greene does not contest this argument, and in fact his RLUIPA claims in the complaint are directed only against defendants Tompkins, Smith and Nee in their official capacities. He seeks only prospective relief under this count.  Compl. ¶ 84. Therefore, I note that while the RLUIPA claims would not be dismissed on this ground because claims for official capacity prospective relief survive the sovereign immunity challenge, the

21

RLUIPA claims must be dismissed because the prospective relief requested in this case is moot, *see* Section IV *supra*.

## VII. INDIVIDUAL CAPACITY CLAIMS

The individual capacity claims that Greene asserts against Cabral, Tompkins, Horgan, Smith, and Nee require that each of the defendants be held liable on the basis of that defendant's own actions. *See Leavitt* v. *Correctional Medical Services, Ind.*, 645 F.3d 484, 502 (1st Cir. 2011). A defendant may not be held individually liable on a *respondeat superior* or other supervisory theory alone; rather, the plaintiff must show that the defendant had a direct connection to the misconduct. "In a § 1983 suit or a *Bivens* action — where masters do not answer for the torts of their servants — the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677.

For a supervisor to be held liable for a supervisee's conduct, liability must be premised on the supervisor's "own acts or omissions." *Whitfield* v. *Melendez-Rivera*, 431 F.3d 1, 14 (1st Cir. 2005). This does not require direct involvement in misconduct, but it does require an "affirmative link" between the supervisor's actions and the alleged violation. "Absent direct participation, a supervisor may only be held liable where (1) the behavior of [his] subordinates results in a

22

constitutional violation and (2) the [supervisor's] action or
inaction was 'affirmatively link[ed]' to the behavior in the
sense that it could be characterized as 'supervisory
encouragement, condonation or acquiescence' or 'gross negligence
. . . amounting to deliberate indifference.'" Id. (quoting
Hegarty v. Somerset County, 53 F.3d 1367, 1379-80 (1st Cir.
1995)).

   Liability may be appropriate under limited circumstances
where the training and supervision of employees led to a civil
rights deprivation even if a supervisor was not directly
involved in or even aware of a specific violation.  Liability is
appropriate in such circumstances only where a supervisor shows
"deliberate indifference" to the "possibility that deficient
performance of the task eventually may contribute to a civil
rights deprivation."  Camilo-Robles v. Zapata, 175 F.3d 41, 44
(1st Cir. 1999).  Deliberate indifference requires that "a
prison official subjectively must both be aware of facts from
which the inference could be drawn that a substantial risk of
serious harm exists, and he must also draw the inference."
Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002).
Supervisory liability under a theory of deliberate indifference
can be found "only if it would be manifest to any reasonable
official that his conduct was very likely to violate an
individual's constitutional rights."  Maldonado, 568 F.3d at

275.  Prison officials "cannot be deliberately indifferent if
they responded reasonably to the risk, even if the harm
ultimately was not avoided."  *Burrell*, 307 F.3d at 7.

Defendants argue that Greene has failed adequately to
allege facts in his complaint to make out a claim of deliberate
indifference, noting what they claim are insufficient
allegations concerning notice and active involvement by each of
the defendants.  This argument, however, appears to rest on the
defendants' misunderstanding of Greene's allegations.  Greene
does not allege that the defendants themselves were directly
involved in the claimed violations; instead, he roots his claims
against the defendants in allegations that each was involved in
creating and implementing the policies and practices at the
Department and the HOC and that each knew or should have known
that the policies and practices concerning food and religious
services for Jewish inmates were unlawful.  In these
circumstances, Greene need not allege that the defendants knew
of or participated in the particular deprivations of which
Greene complains, because a supervisor, "removed from the
perpetration of the rights-violating behavior [] may be liable
under section 1983 if he formulates a policy or engages in a
practice that leads to a civil rights violation committed by
another."  *Camilo-Robles*, 151 F.3d at 7.

The fact that each of the defendants had supervisory roles and were involved in policies and programming would be insufficient to support supervisory liability in this case if the alleged violations were committed by other officers in violation of the policies and programs because there is no allegation that the defendants (other than perhaps Nee) were aware of any deviation from policy or practice.  Here, however, Greene alleges that the misconduct occurred in compliance with the practice, policy, and programs implemented by the defendants.  This language is clearest in relation to Superintendent Horgan, because Greene claims that Horgan was aware that the deprivations of calorically adequate kosher food and access to religious programming occurred "by Department policy and practice."  Compl. ¶ 89.  For all defendants, however, Greene makes the general allegation it is the "Defendants' implementation and oversight of policies that deprived Mr. Greene . . . of sufficient caloric intake."  *Id.* ¶ 103.  *See also id.* ¶ 112 (noting that the subordinates are enforcing policies when they force Greene to go without food or abandon his sincerely held religious beliefs).  At other times, however, Greene appears to claim in more general terms that the defendants' involvement in the highest levels of policy and program decisions for the Department and the HOC meant that they knew or should have known of other violations occurring under

25

their watch.  These latter allegations are not enough on their
own, but other allegations connecting the violations to the
policies and programs created and enforced by the defendants are
sufficient to make out a claim for supervisory liability.

A supervisor is liable only when he or she demonstrates
deliberate indifference.  Greene alleges facts that could make
out deliberate indifference.  Deliberate indifference requires
knowledge of facts from which an official could draw an
inference that a substantial risk of serious harm exists.
*Ramirez-Lluveras* v. *Rivera-Merced*, 759 F.3d 10, 20 (1st Cir.
2014).  In the complaint, Greene claims significant weight loss
and other medical and psychological consequences, which could
fairly make out a grave risk of harm from caloric deprivation,
and he claims that defendants knew of the policies and practices
because they actually created and enforced them.

The question remains, however, whether alleging unnamed
policies and practices that violated Greene's rights is too
conclusory an allegation to survive a motion to dismiss.
Allegations that are conclusory are not entitled to an
assumption of truth.  *Iqbal*, 556 U.S. at 681.  In *Sanchez* v.
*Pereira-Castillo*, 590 F.3d 31 (1st Cir. 2009), the First Circuit
rejected claims against administrative defendants in a case
where officers pressured an inmate to receive unnecessary
exploratory surgery to search for contraband.  The court upheld

26

claims against officers directly involved, but dismissed a
§ 1983 supervisory liability claim pursuant to *Iqbal* against
higher-up administrative defendants, finding that the complaint
merely "[p]arrot[ed] our standard for supervisory liability in
the context of Section 1983 . . . [alleging] that the
administrative defendants were 'responsible for ensuring that
the correctional officers under their command followed practices
and procedures [that] would respect the rights and ensure the
bodily integrity of Plaintiff' and that 'they failed to do [so]
with deliberate indifference and/or reckless disregard of
Plaintiff's federally protected rights.'" *Id.* at 49. The Court
held that language to be conclusory and that it should not be
given credence. *Id.* The sole claim in *Sanchez* that was more
specific was that one of the officers who was directly involved
and was particularly pushy toward medical staff was following
directives and regulations designed and implemented by the
administrative defendants. *Id.* The only regulations described
in the complaint were a strip search and x-ray regulation, and
the court held that the claim that the surgery resulted from
those policies was implausible. *Id.* at 49-50.

Here, Greene does not specify the policies, programs, and
practices that the defendants implemented and oversaw. He does,
however, claim not only that the policies and programs permitted
the violations to occur but that the violations occurred through

27

compliance with those policies and programs.  The First Circuit rejected the allegations in *Sanchez* based on the implausible fit between the named policies and the harm that resulted, not based on the fact that a supervisor is not properly held accountable under § 1983 where an employee commits a violation acting pursuant to a directive or regulation created and implemented by supervisors.  Here, given the absence of a specifically identified policy or program that led to the violations, I do not have the information necessary to measure the fit between the policy or program alleged and the violations.

At this very early stage in the case, I conclude that it would be improvident for me to dismiss the complaint based on the fact that Greene has not specified the policy.  The general theory of supervisory liability based on unlawful policies and practices created and enforced by supervisory defendants is a valid one that states a claim for relief.  Unlike in *Sanchez*, there is no reason apparent on the face of the complaint to discount the connection alleged by Greene between the policies and the alleged violations of his rights.

Nonetheless, Greene's failure to name the specific policies and practices that underlay his claims make the allegations border precariously on the conclusory.  I therefore conclude that the proper course of action in this case is to move this

case as efficiently as possible to summary judgment.  A schedule for doing so will be outlined below.

## VIII. MASSACHUSETTS CIVIL RIGHTS ACT

The allegations against the defendants under the Massachusetts Civil Rights Act, Mass. Gen. Laws c. 12 § 11H & I, in their official capacities are barred by sovereign immunity, as discussed above, *see* Section III *supra,* and are excluded by the statute itself since the Commonwealth is not a "person" within the meaning of the MCRA.  *See Kelley* v. *LaForce*, 288 F.3d 1, 11 n.9 (1st Cir. 2002).  The claims for prospective relief are subject to dismissal as moot.  *See* Section IV *supra.*

## IX. CONCLUSION

For the reasons set forth more fully above, it is hereby ORDERED that Defendants' Motion to Dismiss is GRANTED in part and DENIED in part, in that:

1.  All claims for prospective relief are dismissed as moot;

2.  Official capacity claims for damages under federal law in Counts I, II, III, and IV, are hereby dismissed; and

3.  Official capacity claims for damages under state law in Counts V and VI are hereby dismissed.

Defendants are ordered to file a motion for summary judgment by September 11, 2015.  Plaintiff's response may include an affidavit or declaration detailing any discovery necessary to respond to the motion for summary judgment, *see*

29

Fed. R. Civ. P. 56(d), but should in any event respond to defendants' motion for summary judgment on the merits.


/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE